**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL J. and DEIRDRE J., as** | : | |
| **Parents And Nearest Friends of** | : | |
| **Patrick J.,** | : | **Civil Action No. 1:03-CV-1104** |
| | : | |
| **Plaintiffs** | : | **(Judge Kane)** |
| | : | |
| **v.** | : | |
| | : | |
| **DERRY TOWNSHIP** | : | |
| **SCHOOL DISTRICT,** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM AND DECISION**

**I.      Introduction**

This case arises under the Individuals with Disabilities Education Act of 1997 ("IDEA"),

20 U.S.C. §§ 1400-1487 (2005), on appeal from a decision of the Special Education Due Process

Appeals Panel of the Commonwealth of Pennsylvania ("Appeals Panel").  The underlying action

was commenced on behalf of Patrick J., an eleven-year old boy with autism, by his parents,

Michael J. and Deirdre J. ("Plaintiffs").  Plaintiffs claim that Defendant, Derry Township School

District, failed to fulfill its statutory obligations under the IDEA to offer Patrick a free and

appropriate public education, and that they should be reimbursed for Patrick's private school

tuition with the Vista School, a school that Michael's parents established specifically to educate

autistic children in Hershey, Pennsylvania.

Pursuant to a stipulation, the parties agreed to submit this matter to the Court for

disposition on the administrative record.  After review of the entire administrative record and

applicable law, the Court makes the following decision on the issues presented.  Before turning

to the cross motions for judgment on the administrative record, the Court will first briefly

address Defendant's motion to exclude the report and testimony offered by Plaintiff's expert,

Andrew Klein.  (Doc. No. 34.)

## II.    Motion to Exclude Andrew Klein's Testimony

Mr. Klein is a Certified Mediator in Educational Disputes, and a former regular and

special education teacher, as well as a former hearing officer.  (Doc. No. 34, Ex. C, Curriculum

Vitae of Andrew M. Klein.)  He was retained by Plaintiffs to "offer an opinion regarding the

appropriateness of the school district's substantive and procedural undertakings regarding

developing a free appropriate education [FAPE] for Patrick in the least restrictive environment

[LRE]."  (Doc. No. 34, Ex. A, Report of Andrew Klein.)  In his report offered as an expert

report, Dr. Klein reaches the conclusion that "[the individualized education program developed

for Patrick] was not reasonably calculated to provide meaningful educational benefit to Patrick

on the day it was finalized."  (Id.)  Mr. Klein also concludes that "the district's offer of FAPE in

the LRE at Derry Township Elementary School was inadequate, insufficient and inappropriate . .

. ."  (Id.)  Having established during his deposition that he is not an expert in the field of autism

or in the area of educating children with autism, Defendants moved to exclude Mr. Klein's

testimony on the basis that Mr. Klein is not a qualified as an expert in this case, and because the

testimony was both unreliable and offers inappropriate legal conclusions that are of no assistance

to the Court.  Plaintiffs generally counter that Dr. Klein is qualified as an expert to testify about

the adequacy of the IEP developed for Patrick, and that the report will be helpful to the Court as

trier of fact.

Upon consideration, the Court finds the dispute over Mr. Klein's testimony and report to

be largely misplaced.  The Court agrees with Plaintiff that because the Court is the factfinder in

this action, there is little concern over the factfinder being unduly swayed or prejudiced by the expert's "aura of infallibility." The Court also agrees with Defendant that Mr. Klein's report is not especially helpful in resolving the issues before the Court and adds little the Plaintiff's argument or to the record in this case. Additionally, the Court agrees that, ultimately, Mr. Klein strays into testifying about the ultimate legal issues presented in this action. Nevertheless, the Court finds it unnecessary to "exclude" the report. Rather, the Court has reviewed Mr. Klein's report and his conclusions, and has found them to offer very little assistance to the Court. Accordingly, acknowledging the position of both parties, Defendant's motion to exclude Mr. Klein's report and testimony will be denied.

Having resolved the foregoing dispute, the Court turns to the cross motions for judgment on the administrative record, beginning with a discussion of the facts relevant to this case.

III.    **Factual Background**

Patrick J. was born on August 28, 1994 and resides with his parents, Michael and Deirdre, in Hummelstown, Pennsylvania, which is within the Derry Township School District ("District"). At all times relevant to this dispute, Patrick and his parents have resided within the District.

Immediately after the birth of Patrick and his twin brother, Sean, the boys were placed in a neo-natal intensive care unit ("NICU") and received antibiotic treatment to treat against pneumonia. Due to their placement in the NICU, the brothers were eligible for an infant development program sponsored by the hospital. During this time, a developmental pediatrician diagnosed Patrick with pervasive developmental delay ("PDD"). (N.T. 1159, 1166.) In 1994, Dr. Thomas Bowers identified Patrick as autistic. (Pl. Ex. 3.)

Concerned that Patrick was not progressing adequately, in August 1997 his parents undertook to develop a home therapeutic program built upon the theory of Applied Behavioral Analysis ("ABA").  Relying upon their own resources, Patrick's parents contracted with Rutgers University to obtain a consultant to train the parents and other service providers in ABA methods.  Between September 1997 through December 2001, Patrick received intensive ABA-based services in the home a minimum of 40 hours per week.  It is clear from the record that Patrick made significant progress in the home-based program, and the family achieved the ability to communicate meaningfully with Patrick and to impart basic life skills. At the same time, Patrick continued to resort to his idiosyncratic behaviors when intensive structure was relaxed, often fascinated by private rituals and self-stimulatory behaviors, and unaware of the need to communicate with others.  (N.T. 887, 891, 1146-1154, 1166-1167, 1169, 1286-1289; Pl. Exs. 8 & 47.)

ABA is a systematic, analytical approach to addressing learning as a function of behavior that targets concrete and measurable goals, utilizes constant and consistent data to analyze what techniques are working and how, and draws upon a system of planned reinforcements to bring an autistic child into a world where the child can communicate and function independently.  ABA is marked by consistency and intensity.  During initial phases of ABA, educators and therapists rely upon Discrete Trial Training ("DTT"), which provides a systematic and rapid reward based training for each step of the skills being taught.  ABA utilizes DTT in order to assure that a student begins to master and generalize skills in less restrictive and more natural settings.  In order to achieve the goal of generalization, an ABA program requires implementation by a trained staff, supervision by experienced ABA consultants, and delivery in a variety of settings.

4

(N.T. 748-796, 811-824, 908-09, 1059-1076, 1115-1122; Pl. Ex. 14.)

The parents continued with their home ABA program through 1998 and 1999, employing their own resources as well as medical assistance from an outside program called Provider 50. During this time, Patrick had an individualized education program ("IEP"), and received occupational therapy ("OT") from services provided by the Capital Area Intermediate Unit 15 ("IU-15"), which is contracted to provide special education services to the District.  During early 1999, Patrick began attending the Derry Township Pre-School Program ("Derry Preschool") two afternoons per week, at all times accompanied by an aide from his home program.  Patrick made progress during this period.  (N.T. 897, 899, 1028, 1029, 1056-1058, 1146-1154, 1173, 1176, 1291-1297, 1346-1348, 1369-1371.)

During the 1999-2000 school year, Patrick received educational services in the Derry Preschool three mornings a week, in addition to immersion in the parents' intensive home therapeutic program and receipt of services provided by IU-15.  The IU-15 prepared an IEP for Patrick during this time that included services in speech and language, occupational therapy, and inclusion services.  Patrick continued to make progress in the home ABA program.  (N.T. 362, 363, 901-904, 1062, 1304, 1306, 1346-1348; Pl. Ex. 49, p. 99.)

Although Patrick reached school age and was eligible to begin transitioning to a school-age program at the end of the 1999-2000 school year, his parents elected to keep him in the intensive home-based program for an additional year, coupled with attending regular education preschool four mornings per week, accompanied by his ABA-trained aide.  (N.T. 353, 354, 360-364, 1065, 1066, 1104, 1179, 1309, 1310, 1351; Pl. Ex. 490, p. 99.)

On April 2, 2001, the parents met with District representatives to begin the process of

developing appropriate school-age programming for Patrick.  During their meeting with the

District, the parents discussed their plans to found a specialized school for the education of

autistic children, utilizing exclusively ABA techniques.  (N.T. 34, 35, 44, 1181-1183, 1313,

1323.)  Following this meeting, Michael's father sent an email to the District's Director of

Special Education, Sherry Zubeck, formally requesting that the District conduct an evaluation of

Patrick, and suggesting that the District have a school psychologist observe Patrick within the

parents' home program.  (Pl. Ex. 4.)

On April 30, 2001, Michael J. sent a follow-up email requesting information on when the

District expected to have developed Patrick's IEP.  Sherry Zubeck responded by letter dated

May 7, 2001, in which she expressed interest in reviewing details about the specialized school

the parents were planning to start, and noted that the District expected to conduct a Multiple

Disciplinary Evaluation ("MDE") in the near future.  (N.T. 1184, 1313, 1314.)  On May 18,

2001, the District formally requested permission to conduct an MDE of Patrick, and on May 22,

2001, the parents gave their written consent to such evaluation.  (N.T. 44, 1314.)  In connection

with this MDE, on May 17, 2001, an occupational therapist observed Patrick while he attended

Derry Preschool, and noted that Patrick roamed around the room, made little eye contact,

attempted some parallel play, responded to environmental cues at times, sometimes answered

direct questions, and circled the perimeter of the playground.  (Pl. Ex. 8.)

On June 20, 2001, Child Psychiatrist Dana L. Crites issued a psychiatric evaluation.  This

evaluation indicates that Patrick was given psycho-educational testing on June 7, 2001,

administered by Daniel Russo, a school psychologist.  (Pl. Ex. 7.)  On the Stanford-Binet

Intelligence Scale 4th Edition, Patrick obtained a Full Scale IQ 47, with Verbal Reasoning 59,

Abstract/Visual Reasoning 58, Quantitative Reasoning 54, and Short-Term Memory 52.  On the

Woodcock Reading Mastery Test, he obtained standard scores of Letter Identification 101 and

Word Identification 112.  On the Bracken Basic Concept Scale-Revised, Patrick obtained a

School Readiness Composite standard score of 63 with wide discrepancies between subtests,

indicating that Patrick had more ability with colors, letters, numbers, and shapes, and less ability

with language.  (Id.)

The District also contributed test results used in the psychiatric evaluation.  Speech

Therapist, Pamela Yocum, administered several tests, including the Peabody Picture Vocabulary

Test, the Expressive One Word Picture Vocabulary Test, and the Preschool Language Scale,

which tested both auditory comprehension and expressive communication.  After evaluating

Patrick's scores on the foregoing tests, Dr. Crites indicated that Patrick "was noted to have

severe receptive, expressive, and pragmatic language delay with need for intensive speech and

language services in his school program."  (Id.)  Dr. Crites noted that the data collected by

occupational therapist Sheila Miller indicated that Patrick's fine and gross motor skills "seemed

functional for school."  (Id.)  Upon consideration of the data obtained, Dr. Crites confirmed Dr.

Bowers' original diagnosis of Autistic Disorder, diagnosed Patrick as moderately mentally

retarded based upon an IQ score of 47, and identified Patrick as presenting serious impairment in

communication ability.  (Id.)  Dr. Crites recommended identifying Patrick as an exceptional

student with the school exceptionality of "Autism/PDD" and indicated that he would require

special education services including speech/language, occupational therapy, and academic

support.  (Id.)  Additionally, Dr. Crites's evaluation recommended a "multi-faceted program

including placement with other special needs students as well as opportunity for mainstreaming

and hopefully some generalization of acquired skills . . . ."  (Id.)

Sometime prior to June 20, 2001, the parents, together with other similar minded parents of children with autism, formed the Central Pennsylvania Autism Education and Resource Center ("CPAERC").  The group planned to form and operate a private licensed academic school that would feature instruction through the use of ABA techniques.  Patrick's father is the President of CPAERC and the address for the organization is the father's place of employment.  (N.T. 1162; Pl. Ex. 6.)

On June 20, 2001, the District issued the parents a Comprehensive Evaluation Report ("CER").  The CER contains information supplied from the parents regarding Patrick's development, and summarizes the findings compiled by Drs. Bowers and Crites, and the reports from other professionals who evaluated Patrick.  The CER concluded that Patrick met the diagnostic criteria for autistic disorder and was found to be in the 01st percentile for his age in terms of cognitive abilities.  (Pl. Ex. 8.)  The CER recommended that Patrick have an IEP and receive OT and speech/language services.  Deirdre J. agreed with the recommendations contained in the CER.  (Id.)

Following receipt of the CER, the parents requested recommendations from the Rutgers University Autism Program regarding Patrick's future educational needs.  (Pl. Ex. 9.)  In response, Kendra Peacock, a behavioral specialist with the Rutgers program, emphasized Patrick's acute need for a "highly structured educational setting, reinforcement to be used as a primary tool for teaching, and a thorough and systematic approach to learn."  (Id.)  Ms. Peacock opined that "[o]nly a specialized placement with people trained in these areas will be able to meet [Patrick's] educational needs."  (Id.)  Among other recommendations, Ms. Peacock

indicated that Patrick required a 1:1 teaching ratio and systematic transition planning to allow

him to learn in very small group settings.  To facilitate Patrick's need for transitions, Ms.

Peacock recommended use of visual supports, including an icon/word schedule to navigate

transitions between classrooms, and a token system of rewards for reducing hand and vocal self-

stimulatory behavior.  (Id.)

Central to Ms. Peacock's recommendations was the continued use of reinforcement in

Patrick's instruction.  Ms. Peacock stated that "interventionists" in Patrick's new placement

"must be fluent at the use and interpretation" of contingent, immediate, and differential

reinforcement, as well as request training to encourage Patrick to request his own reinforcers

throughout the day, particularly to facilitate language development.  (Id.)  Ms. Peacock also

indicated her view that Patrick's peers within the educational environment must have skills to

utilize request training to facilitate Patrick's educational development.  (Id.)  Finally, Ms.

Peacock indicated that because Patrick was at "a critical juncture in his education," any

transition from his familiar home environment to a new educational setting needed to proceed

with "the utmost care."  (Id.)  Ms. Peacock suggested that without such a careful, structured, and

systematic approach, Patrick was at risk for regression in academic and functional skills.  (Id.)

The District invited the parents to participate in an IEP meeting on July 18, 2001.  This

initial IEP meeting was attended by the following individuals:  the parents; Sherry Zubeck, the

Director of Special Education; an OT; a speech pathologist; a special education teacher; and a

regular education teacher.  (Pl. Ex. 10.)  The IEP included present levels of educational

performance, strengths, needs, measurable annual goals, short-term objectives, and specially

designed instruction that included TEACHH strategies, ABA, one-to-one instruction, small

group instruction, manipulatives, repeated practice, a hand-writing series, and verbal and visual prompts.  (Id.)

The IEP generated through this meeting was not a final version and the District IEP team agreed to consider revisions.  One of the reasons that the IEP was not finalized and a Notice of Recommended Educational Placement ("NOREP") not issued is that the parents were adamant that Patrick's needs could best be met through the private school they planned to open.  (N.T. 36, 48, 49.)  Sherry Zubeck testified that the District did not proceed to a due process hearing and remained willing to consider the parents' proposed placement, but that the team could not blindly agree to a placement in a school program that did not yet exist.  (Id. 36, 93.)  In particular, the District team was concerned about opportunities for Patrick to interact with nondisabled peers if he were to be placed at the parents' proposed school.  (Id. 36.)  The parents agreed to provide further information to the District, and other school districts, regarding the proposed school.  (Id.)  Sherry Zubeck testified that she felt certain that the District could meet Patrick's needs, but she did not want to disregard the parents' planned school as an option to the extent it was found to be equally appropriate.  (Id. 49.)

During this time, the District was represented by outside counsel, Jeff Champagne, who is a member of the law firm McNees, Wallace & Nurick LLC ("MWN").  Patrick's father, Michael J., is also a member of MWN.  Between the first IEP meeting of July 18, 2001 and August 16, 2001, Michael J. and Jeff Champagne exchanged a number of email messages concerning the parents' progress on opening their planned school for the education of autistic children.  In particular, counsel for the District and Patrick's father corresponded regarding anticipated costs associated with the new school, as well as the District's repeated requests to

10

learn of other school districts that were considering placements at the planned school.  (N.T. 1200-1204.)  Also during this time, Attorney Champagne and Michael J. engaged in conversation with the MWN member in charge of ethics at the firm to discuss the potential for conflict of interest if MWN continued to represent the District in negotiation with the parents. (Id. 1200.)  Although Attorney Champagne felt he could adequately represent the District in spite of his professional relationship with Patrick's father, the men were admonished that if negotiations between the parents and the District devolved into litigation, the firm would have to reconsider the engagement.  (Id.)

In consideration of the difficulty the District faced in working toward timely placing Patrick in the planned ABA school sponsored by CPAERC even though the school was not operational, on August 16, 2001, the parents executed a 45-day waiver of the District's obligation to provide Patrick with appropriate educational services.  (Pl. Ex. 13.)  This waiver period ran for 45 days from the earlier of:  (1) the date on which the parents notified the District that the planned school would not operate during the 2001-2001 school year; or (2) the date on which the District notified the parents that it no longer looked favorably at placing Patrick at the school.  (Id.)  The waiver letter was drafted and revised by both Attorney Champagne and Michael J., and expressed the parents' understanding that although the District continued to require more information about the planned school, the District "look[ed] favorably upon placing Patrick at the

School."  (<u>Id.</u>; N.T. 1205-1207.)[1]

On August 21, 2001, the parents sent a memorandum to a number of individuals who were interested in the planned school but had missed CPAERC's August 14, 2001 presentation regarding the school's progress toward operating.  (Pl. Ex. 14.)  The memorandum indicated that the school was to be officially called The Vista School ("Vista") and that CPAERC had received indications from two school districts expressing interest in placing two children with Vista.  (<u>Id.</u>)  The memorandum also indicates that Vista would commence operations once the school had received agreements from school districts to place an additional four children in the school.  (<u>Id.</u>)

Approximately one week later, Michael J. wrote to Sherry Zubeck indicating that Vista would be delayed in opening and expressing an interest in developing an "appropriate interim placement for Patrick."  (Pl. Ex. 15.)  The letter served as formal notice to the District that the 45-day waiver extended by the parents was to begin running.  (<u>Id.</u>)  In the letter, Michael J. represented the parents' understanding that the District was willing to explore placing Patrick in an early-elementary setting, as evidenced by the District's "expression of interest in a Vista School placement[.]"  (<u>Id.</u>)  The letter states that if the parents did not receive a letter to the contrary within five business days, the parents would assume that their proposal for Patrick's interim placement (also contained in the letter) would "form the basis" for discussions going

---

[1]      The Appeals Panel subsequently determined that the District's delay in evaluating Patrick until May 2002 amounted to a violation of its duty to provide him with FAPE by having a program in place at the start of the 2001-2002 school year.  In so finding, the Appeals Panel stated that "[t]he supposed 'waiver' of the District's duty to provide FAPE is not valid and offers no protection to the District."  (Def. Ex. B.)  Accordingly, the Special Appeals Panel held that Patrick was owed 540 hours of compensatory education, representing the period from the beginning of the 2001-2002 school year through December 18, 2001.  (<u>Id.</u>)  The District  has not challenged this ruling in the instant proceedings.

forward.  (<u>Id.</u>)

The parents specifically proposed an interim home placement for Patrick, with educational and therapeutic components "provided under a common set of protocols."  (<u>Id.</u>)  The parents proposed that the therapeutic component would be funded by Medical Assistance, with the exception of speech/language and OT, for which the parents requested District funding.  (<u>Id.</u>)  The parents also proposed to retain the services of a classroom instructor who was "private-ed certified" and experienced with ABA methodology, and requested that the District fund such teacher's salary.  (<u>Id.</u>)  The parents asserted that they would retain their current consultant, Accelerated Learning LLC, and would agree to pay 25% of the consulting fees relating to therapy, with the District responsible for the remaining 75% relating to educational services.  (<u>Id.</u>)  The parents agreed to pay for the facility and material costs associated with the proposed home program.  (<u>Id.</u>)

In order to provide the District with "reasonable due diligence" on the parents' proposal, the parents announced that they would provide the District with the following information: outcomes data from Patrick's then-current home program; a detailed budget; proposed curriculum and instructional methodology; resumes of staff and consultants; description of training protocols; proposed needs assessment and other provisions for Patrick's IEP; and a proposed methodology for data collection and outcomes reporting.  (<u>Id.</u>)

Alternatively, the parents also agreed to consider an interim placement for Patrick with the IU-15 autism-support program operated out of Hershey Elementary School, and requested that the District provide them with the same data and other information about IU-15 that the parents agreed to provide regarding their home program.  (<u>Id.</u>)

13

The parents suggested that the parties exchange information within thirty days and take a minimum of two weeks to review and prepare for an IEP meeting, at which time it was hoped the parties would resolve Patrick's interim placement. In any event, the parents requested that such a meeting be held within 45 days from the date of the Michael J.'s letter. (Id.)

By letter dated August 30, 2001, Sherry Zubeck responded to the parents' proposal. (Pl. Ex. 16.) Ms. Zubeck indicated that she was unable to respond fully to the letter within the requested five days, and proposed to present her initial reactions during the week of September 4, 2001. (Id.) At the same time, Ms. Zubeck concurred with the parents' desire to move forward expeditiously with educational planning for Patrick, given that the school year had already commenced. (Id.) Ms. Zubeck closed the letter by noting the failure of the Vista School to open and the parents' new request for a home-based program was "somewhat unexpected" and would require the District to consider the proposal carefully. (Id.)

On September 5, 2001, Patrick underwent another psychiatric evaluation, this time administered by Dr. Michael J. Murray at Ephrata Community Hospital. (Pl. Ex. 17.) Patrick's parents requested the evaluation to determine an appropriate educational placement for Patrick. (Id.) The evaluation contains a comprehensive history of Patrick's condition and development, a review of his psychiatric and medical history, and a mental status examination. (Id.) Dr. Murray concluded that Patrick's autism conferred impairment in the use of non-verbal behaviors such as eye contact and facial expressions; difficulty with peer relationships; a lack of spontaneous seeking to share enjoyments and interests; lack of spontaneous and imaginative play; and self-stimulatory behaviors. (Id.) Dr. Murray observed that "Patrick's difficulties have been mitigated somewhat by his long-standing immersion in an Applied Behavioral Analysis (ABA)

14

home program." (Id.)  Dr. Murray strongly encouraged continued use of the ABA with Patrick, noting that ABA "and their educational techniques have been the only empirically documented forms of treatment to successfully teaching children with moderate to severe autism new skills and abilities." (Id.)  Dr. Murray found it would be important for Patrick's educational plan to be unified in all environments in his life, and that such educational plan be consistent. (Id.)  Until such a comprehensive ABA program could be made available to Patrick, Dr. Murray recommended that Patrick's parents continue their home-based program. (Id.)

Under cover of letter dated September 28, 2001, Attorney Champagne provided Dr. Murray's evaluation to the District. (Pl. Ex. 19.)  Additionally, Attorney Champagne presented a proposed budget for the parents' home program, and a generalized IEP that was intended to be helpful to the District in formulating an educational approach for Patrick. (Id.)  In this letter, Attorney Champagne represents that Patrick's parents "had wanted to present a draft IEP for consideration by now, but [are] unable to do so.  This is in part because the family had hoped to have an analysis of performance data by now, but the family does not have it." (Id.)

Following several conversations with Patrick's father, Attorney Champagne sent a written report to Sherry Zubeck dated October 12, 2001. (Pl. Ex. 20.)  In this report, Attorney Champagne represented that Patrick's father did not object to the District's counsel attending IEP meetings, although the parents left open the possibility of bringing their own counsel. (Id.)  Additionally, Patrick's father did not believe that the staff provided by Medical Assistance were capable of providing adequate services to Patrick and the family was willing to pay an additional amount to secure competent personnel. (Id.)  At this time, the parents were not fixated on obtaining a placement in their home program, nor were the parents demanding that if placement

began in the home, it would have to remain there.  (Id.)  The parents did not oppose efforts by

the District to contract with or employ Patrick's key teacher from his home program.  (Id.)

On October 19, 2001, Attorney Champagne faxed Sherry Zubeck a detailed program

developed by Kendra Peacock, the special consultant working with Patrick's family, that set

forth numerous proposed goals and objectives to be incorporated into Patrick's IEP.  (Pl. Ex. 21.)

Although the proposed program contained a number of annual goals, the draft was silent as to a

particular method of instruction recommended to achieve these proposed goals.  (Id.)

On November 15, 2001, the IEP team convened to prepare Patrick's IEP.  This meeting

was attended by the following people: Patrick's parents; Jeff Russo, a school psychologist who

had previously evaluated Patrick; Traci Landry, a regular education teacher; Kendra Meyer, a

special education teacher; Sherry Zubeck; Kendra Peacock, the parents' consultant and behavior

analyst; Pamela Yocum, a speech/language pathologist who had evaluated Patrick; Attorney

Champagne as the District's solicitor; Rosemary Holecki, the IU-15 autistic support supervisor;

Cathy Scutta, an occupational therapist; and Gay Keiser, the IU-15 assistant supervisor for

speech/language services. (Pl. Ex. 23.)  The parents did not know that members of IU-15 would

be present at the meeting, and Michael J. was uncomfortable about their presence because he

considered IU-15 to represent a "competitor service provider" to Vista.  (N.T. 1223.)

As part of this meeting the team discussed the parents' proposal but did not discuss any

counterproposal of the District.  Specifically, the primary topic of conversation was the

educational goals and expectations contained in the detailed program developed by Kendra

Peacock and provided to the District on October 19, 2001.  (N.T. 1224.)  In connection with this

meeting, the IEP team compiled data concerning Patrick's then-present levels of educational

performance, including the June 7, 2001 pyschoeducational assessment administered by Dan

Russo, a speech and language evaluation dating from May 2001, and an occupational therapy

evaluation that appears to reflect the results of Sheila Miller's OT evaluation conducted in early

summer 2001.  (Id.)  Although it does not appear that the parents had provided updated

educational levels at this November 15, 2001 meeting, Patrick's current teacher advised the IEP

team that the data relating to his occupational skill levels was "very accurate."  (Id.)

     During the meeting, the parents suggested that the District employ certain of the

individuals providing services in their home program and to contract with Accelerated Learning

for consultation services.  Numerous goals and objectives that the parents submitted for the

team's consideration were not measurable and the parents agreed to submit them in measurable

terms.  Although the hearing officer limited testimony regarding the tenor of the November 15

meeting, it is clear from the record that the District's representatives felt that Patrick's father

became increasingly angry as the meeting progressed, impugned the abilities of the District's

IEP team, referred to the District's proposals as "garbage" and eventually indicated he did not

want to continue with the IEP process.  (N.T. 442, 448, 452-453, 462.)  Deirdre J. described the

November 15 meeting as "extremely tense" and having ultimately gotten "out of control."  (N.T.

1375.)  Eventually, it became clear that the IEP team was not going to be able to complete the

IEP during that particular meeting and the team agreed to reconvene in December.  Following

consultation with their individual calendars, the team tentatively agreed to meet again on

December 12, 2001.  (N.T. 1335.)  The District expected that by that time the parents would be

able to submit updated educational levels to be used to complete Patrick's IEP.

     Following the November 15 meeting, Sherry Zubeck contacted Matt Bowman of

Accelerated Learning, and also Kelli Smith, who was Patrick's teacher in the home program, about working with the District in the event it was proposed that Patrick be educated in IU-15. (N.T. 40-42.)  According to Sherry Zubeck, Matt Bowman expressed a willingness to assist and Kelli Smith was open to considering a possible arrangement with the District, but no offers were actually extended.  (Id. 42, 134, 229, 230, 251, 1237, 1238.)

Also following the November 15, 2001 meeting, Patrick's mother visited the IU-15 autistic support classroom, housed at Hershey Elementary School.  (N.T. 1333.)  This meeting lasted for approximately one hour, during which time Deirdre J. observed four students in a variety of morning activities.  (Id.)  Patrick's mother reported observing "wide variability in the quality of the interaction" between students and personnel, and she observed that certain of the employees were "better trained" than others.[2]  (Id. 1334.)  Deirdre J.'s primary concern focused on the level of reinforcement available to each of the children, noting that one student appeared to lack adequate oversight, allowing him to engage in self-stimulatory behavior that was left unchecked.  (Id. 1334-1335.)  Additionally, Deirdre J. believed that the reinforcement offered to the students was inadequate and differed from what Patrick was used to in his home program.  (Id. 1335.)  However, Patrick's mother felt positively about the teacher in the autistic support classroom.  (Pl. Statement of Material Facts, ¶ 26.)

On November 29, 2001, Sherry Zubeck and two members of IU-15, Rosemary Holecki and Gay Keiser, visited Patrick's home and observed his home program for approximately one hour.  (N.T. 1336-1338.)  As originally contemplated, the District and IU-15 planned to visit the

---

[2]     Patrick's mother also testified that she did not know what training the IU-15 staff had regarding the education of autistic children.  (Def. Ex. P., p. 63, ll. 18-22.)

home program for three hours, but Sherry Zubeck later cut the scheduled length of the visit.  (Id. 1336.)  During this meeting, the District representatives observed Patrick engage in a reading activity and a preverbal drill.  Additionally, they watched Patrick draw lines on paper, identify pictures, use a visual schedule, make oral sounds, and prepare a sandwich.  The team observed that Patrick presented good concentration in a one-on-one situation, had good decoding skills but lacked comprehension, could count from one to one hundred, but did comprehend a one-to-one correspondence.  The observers noted that Patrick transitioned well from one activity to another.

During this time, negotiations between the parents and the District became rancorous and essentially broke down.  At some point in early December, the District elected to replace Jeff Champagne and MWN with new counsel.  Patrick's parents interpreted the District's retention of new counsel as indicating an intent to litigate.  (N.T. 1240.)  Accordingly, the parents retained counsel to represent Patrick's interests in the continued negotiations with the District and, if necessary, any litigation that may have ensued.  (Id. 1241-1242.)

On December 7, 2001, the District's new counsel, Katrina Filiatrault of Sweet Stevens Tucker & Katz, sent a facsimile to the parents' counsel, Yvonne Husic.  The faxed memo notes that the District had attempted unsuccessfully to contact Attorney Husic to discuss the parents' offer of settlement, but would like to speak with her to discuss their proposals.  (Pl. Ex. 24.)  Additionally, the memo stated that the District would proceed with the previously-scheduled IEP meeting on December 12, 2001:  "Please note that the District would welcome the parents' input at the meeting, but if the parents choose not to attend and provide input, the District may proceed without them."  (Id.)

By letter dated December 11, 2001, Attorney Husic responded to the District.  (Pl. Ex.

25.)  In this letter, Attorney Husic represents that the parents requested that she attend the December 12 IEP meeting to represent their interests, but that she would be unable to attend on that date due to a scheduling conflict.  (Id.)  Attorney Husic then states that the District's new counsel represented to her during a telephone call on that day that she planned to attend the December 12 IEP "in spite of [her] notice . . . that the parents will not be participating."  (Id.) Attorney Husic then demanded a due process hearing in the event the District's counsel attended the hearing, and threatened to have the December 12 IEP meeting be declared null and void due to the absence of the parents.  (Id.)  In the letter, Attorney Husic represented that the parents remained willing to meet with District representatives, but absolutely refused any further meetings that included members of IU-15.  (Id.)  The parents refusal was apparently due to the fact that the parents had "categorically rejected" any educational program offered by the IU-15 because the IU-15 had allegedly notified the parents that they could not provide "an appropriate program and placement that is currently available to [Patrick] in his homebound IEP."  (Id.) Attorney Husic also threatened that if the District "refuse[d] to discontinue services of IU #15 immediately and cease providing the IU with information about Patrick, we are left with no choice except to treat and act upon further IU 15 involvement by the District . . . as a FERPA violation and a corresponding complaint will be filed."  (Id.)  In closing, Attorney Husic advised that Patrick's parents planned to "unilaterally place Patrick in the Vista School commencing February 4, 2002."  (Id.)

       As scheduled, the District conducted a full-day IEP team meeting on December 12, 2001. The meeting was attended by the following individuals: Sherry Zubeck; Traci Landry, a regular education teacher; M. Kay Dull, a Principal within the District; Rosemary Holecki, an

Supervisor with the Capital Area Intermediate Unit ("CAIU") which included IU-15; Gay

Keiser, the CAIU Assistant Supervisor; Richard Dale, the CAIU Director of Special Services;

Linda Brewer, the Assistant Superintendent of the District; Katrina Filiatrault, the District's new

counsel; and Cathy Scutta, an occupational therapist with the CAIU.  (Pl. Ex. 27.)  Neither the

parents, their new counsel, nor Patrick's behavior analyst attended or participated in the

December 12 meeting.

The IEP developed at the meeting included the present levels of Patrick's educational

performance that were included in the IEP draft of November 15, 2001.  Additionally, the

December 12 IEP included information obtained from the observations of Patrick's home

program that were noted during the visit to the home on November 29, 2001.  These

observations included information regarding Patrick's motor skills, behavior, reading and writing

skills, communication abilities, social interaction, and sensory reactions.  (Id.)  Because the

parents still had not provided the District with Patrick's updated present educational levels, such

information was not incorporated into the December 12 IEP.  (N.T. 183.)  The IEP contained

goals and objectives that included participation in social situations, improvement in

mathematics, progress in communication arts, self-regulation and behavior, participation in two-

way communication routines, and improvement in both expressive and receptive language

ability. (Pl. Ex. 27.)  The IEP contained 21 program modifications and a variety of specially-

designed instruction.  (Id.)  The IEP provided for two 30-minute speech/language therapy

sessions per week, as well as two 30-minute OT sessions per week.  (Id.)  The IEP provided for

school supports that included a behavior analyst from the Pennsylvania Training and Technical

Assistance Network ("PaTTAN"), an autism consultant, an educational consultant, a

speech/language consultant, and occupational therapist, a school psychologist, and a positive behavior consultant from IU-15.  (Id.)  The IEP also contained a transition plan to help move Patrick from his exclusively home-based program into a school program.  (Id.)

On December 19, 2001, the District sent a NOREP to Patrick's parents dated December 7, 2001, together with a copy of the December 12, 2001 IEP.  (Def Ex. K.)[3]  The NOREP recommended full-time placement in the IU-15 autistic support classroom.

On February 4, 2002, the Vista school opened and Patrick began attending Vista on that day.  (N.T. 1256, 1355, 1373.)  Patrick remained at Vista for the 2002-2003 school year.  During that school year, Patrick's parents on numerous occasions informed the District that Patrick would remain at Vista for the duration of the 2002-2003 school year and that they were not seeking special education services from the District during that time.  On July 9, 2002, the parents' counsel advised the District that Patrick would remain enrolled in Vista for the remainder of the 2002-2003 school year.  (Def. Ex. C ¶ 13.)[4]  In an email dated September 11, 2002, Patrick's father expressed his expectation that "[b]efore the end of the school year" District and Vista personnel would collaborate to produce a long-range plan for Patrick.  (Def. Ex. M.)  Less than one month later, in a letter dated October 1, 2002, Patrick's father wrote a letter intended in part to "clarify the situation for [the District's] lawyers" in which he stated: "The parents are requesting no special education services from [the District] or [IU-15]

---

[3]       The NOREP was initially created on December 7, 2001 and modified on December 19, 2001.

[4]       In the same letter, the parents' counsel indicated that the parents were interested in establishing inclusion opportunities for Patrick, but continued to reject any involvement of IU-15 whatsoever.  (Def. Ex. L.)

22

whatsoever." (Def. Ex. N.) (original emphasis.) In that same letter, Patrick's father asserted that the parents' position would not change until such time as the District and/or IU-15 "demonstrates the willingness and ability to obtain" additional personnel trained by nationally-recognized experts in ABA. (Id.) Because the parents perceived that the District and IU-15 did not show any willingness to comply with this demand, the parents noted that they "respectfully decline special education services on a continuing basis." (Id.) Three weeks later, in a letter dated October 23, 2002, the parents' counsel informed the District that "Patrick will remain at Vista for the remainder of the 2002-2003 school year." (Def. Ex. L.) During a deposition taken during these proceedings, Patrick's mother acknowledged that the parents had no intention of returning Patrick to the District for the 2002-2003 school year. (Ex. O, p. 98 ll. 12-17.)

On December 13, 2002, the parents requested a second special education due process hearing seeking reimbursement for Patrick's tuition at the Vista school for the 2002-2003 school year. (Def. Exs. C & D.) Both the Hearing Officer and the Appeals Panel determined that the parents were not entitled to tuition reimbursement for the 2002-2003 school year.[5] (Id.)

## IV.    Legal Framework and Standard of Review

Parents may initiate an impartial due process hearing to challenge their child's evaluation, placement, or the provision of free appropriate public education. 20 U.S.C. § 1415(f). In Pennsylvania, which has a two-tier review system, this review is conducted by the local education agency. 22 Pa. Code § 14.162. The decision of the Hearing Officer can be

---

[5]    Specifically, after considering the evidence, the Hearing Officer concluded as follows: "Parents cannot expect and school district's cannot be required to continue to expend the resources necessary to update IEPs for children no longer enrolled in district programs. When and if Patrick's parents enroll him in the District, then and only then will the District have the responsibility to develop a new IEP to meet Patrick's educational needs." (Def. Ex. C, at 6.)

reviewed independently at the state educational agency level.  20 U.S.C. § 1415(g); 22 Pa. Code § 14.162.  The party aggrieved by the administrative decision has a right to bring a civil action in state or federal court.  20 U.S.C. § 1415(i)(2)(A).  This Court has jurisdiction of such actions "without regard to the amount in controversy."  20 U.S.C. § 1415(i)(3)(A).

In actions brought under the IDEA, "the court – (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  Id. at § 1415(i)(2)(B).  In order to prevent district courts from imposing their own views of preferable educational methods on the states given this broad scope of review under the statute, the Supreme Court has held that courts must give "due weight" to the administrative proceedings.  Bd. of Ed. of the Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176, 205-06 (1982).  The amount of deference to accord the administrative proceedings is left to the court's discretion, and it "must consider the administrative findings of fact, but is free to accept or reject them."  Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1219 (3d Cir. 1993).

In two-tier systems, the Appeals Panel exercises plenary review over the Hearing Officer, except that it should accord the Hearing Officer with deference on credibility judgments "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion."  Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995).  If the district court finds it appropriate to depart from the hearing officer's or the Appeals Panel's findings, it should give reasons for such departure. Id. at 527.

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs[.]" 20 U.S.C. § 1400(d)(1)(A).  The Act defines free appropriate public education ("FAPE") as:

> special education and related services that –
> **(A)** have been provided at public expense, under public supervision and direction, and without charge;
> **(B)** meet the standards of the State educational agency;
> **(C)** include an appropriate preschool, elementary, or secondary school education in the State involved; and
> **(D)** are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(8).  Drawing upon this statutory definition and the definitions of "special education" and "related services," the Supreme Court noted that "a 'free appropriate public education' consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." Rowley, 458 U.S. at 188-89.  The Rowley Court concluded that states must only provide disabled students with an education "sufficient to confer some educational benefit upon the handicapped child." Id. at 201.  The United States Court of Appeals for the Third Circuit has interpreted Rowley to hold that the IDEA calls for more than a trivial or de minimis educational benefit and, in fact, that school districts must confer "meaningful" educational benefits that allow disabled students to "achieve significant learning." T.R. v. Kingwood Township Bd. of Educ., 205 F.3d 572, 577 (3d Cir. 1999) (citing Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 182-84 (3d Cir. 1988)).  The Third Circuit went on to hold that "the question whether benefit is de minimis must be gauged in relation to the child's potential." Id. at 185.  The Court similarly held that a district court must consider the

child's intellectual potential in analyzing whether a school district offered FAPE.  <u>Ridgewood</u>

<u>Bd. of Educ. v. N.E.</u>, 172 F.3d 238, 247-48 (3d Cir. 1999).  Nevertheless, the requirement that

school districts provide meaningful educational benefit to disabled students does not mean that

school districts must maximize such students' potential.  <u>Rowley</u>, 458 U.S. at 197, n.21

("whatever Congress meant by an 'appropriate' education, it is clear that it did not mean a

potential-maximizing education").

The primary vehicle for delivering FAPE is the IEP.  20 U.S.C. §§ 1401(11),

1414(d)(1)(A); <u>Polk</u>, 853 F.2d at 173.  "The IEP consists of a detailed written statement arrived

at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the

child's education and specifying the services the child will receive."  <u>Polk</u>, 853 F.2d at 173.  The

IEP must include, among other things, a statement of the child's current level of educational

performance, annual goals for the child, measurable immediate steps or major milestones to

monitor progress, specific educational services to be provided, and a statement of the extent to

which the child will participate in regular educational programs.  34 C.F.R. § 300.347.  In

addition to substantive requirements, the IDEA imposes numerous procedural safeguards to

ensure proper development of the IEP and to protect the rights of parents and guardians to

challenge the IEP.  <u>Rowley</u>, 458 U.S. at 205-07.

<u>Rowley</u> instructs that when a district court undertakes a FAPE analysis, it must engage in

a two-part examination.  First, the court must determine whether the school district complied

with the procedural requirements of the IDEA.  Second, the court must determine whether the

IEP which was the product of such procedures is in substantive compliance with the student's

needs.  <u>Rowley</u>, 458 U.S. at 206-07; <u>Ridgewood Bd. of Educ. v. N.E.</u>, 172 F.3d 238, 247 (3d Cir.

1999).

In the case at bar, Plaintiffs have argued that the IEP process was replete with procedural irregularities and defects, and have additionally argued that the December 12 IEP was substantively deficient, all in violation of the IDEA.  The Court will address Plaintiffs' procedural claims first, before turning to the substantive arguments.

### A.      Procedural Claims

The Supreme Court has emphasized the importance attached to the procedural requirements of the IDEA and applicable regulations:

> [W]e think that the importance Congress attached to these procedural safeguards cannot be gainsaid.  It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents . . . a large measure of participation at every stage of the administrative process . . . as it did up on the measurement of the resulting IEP against a substantive standard.  We think that the congressional emphasis upon full participation of concerned parties throughout the development of the IEP . . . would in most cases assure much if not all of what Congress wished in the way of substantive contents of an IEP.

Roley, 458 U.S. at 205.  Fully appreciating the importance of the procedural safeguards embedded within the IDEA, the Court turns to Plaintiffs' specific charges of procedural irregularities.

Plaintiffs first argue that the District's failure to offer a timely IEP at the beginning of the 2001-2002 school year constituted a significant procedural defect that had the effect of depriving Patrick "of the all-important opportunity to begin a school program at the commencement of the school year and to engage in truly meaningful transition experiences which everyone acknowledged he would need from the one-on-one home ABA to the less intense school-based program."  (Doc. No. 36, at 7.)

27

Plaintiffs acknowledge that the Appeals Panel determined that the District's delay in offering Patrick FAPE from the beginning of the 2001-2002 school year until December 17, 2003 constituted an IDEA violation and the District was accordingly assessed with providing Patrick with 540 hours of compensatory education.  Accordingly, the Appeals Panel has already identified this procedural defect and the District has not challenged this finding and assessment. Nevertheless, it appears the parents are arguing that this procedural default on the part of the District represents an additional defect, or at least represents an additional reason as to why the parents believe the December 12 IEP was the result of procedural defects.  The Court does not find that the effect of this delay necessarily means that the December 12 IEP should be considered defective because of the District's initial failure to offer FAPE at the beginning of the school year.  Plaintiffs offer no citation to the record in support of this argument with respect to Patrick's unique needs, nor do they offer caselaw that would support the general proposition that failure to offer FAPE at the beginning of the school year is a defect of such magnitude that a subsequently offered IEP should automatically be considered procedurally defective.

Second, Plaintiffs contend that the District failed to obtain "updated and meaningful Present Educational Levels" as baseline data for Patrick's IEP and that this failure "effectively denied P.J. an appropriate IEP in December 2001."  (Id.)  Although the parents concede that the District administered diagnostic testing in June 2001 towards developing Patrick's CER, they assert that the District's efforts were inadequate, because it did not undertake "numerous observations in structured and unstructured settings, and across environment in educational and community settings" which are allegedly "necessary to really assess what strategies work and what do not."  (Id.)  The parents also argue that the District's 45-60 minute observation of

28

Patrick's home program was insufficient because the representatives engaged in very limited discussion with Patrick's teacher and ABA consultant, and they did not review data to track his learning methods and his current level of functioning.  (Id. 7-8.)  Plaintiffs contend that their ABA consultant, Kendra Meyer, analyzed and summarized this data for the District, but they claim the District did not utilize the data in developing Patrick's IEP.  (Id. 8.)

Other than citation to a book by the National Research Council regarding the education of children with autism, the parents do not explain how the alleged failure on the part of the District to undertake "numerous observation" in a variety of settings, the June 2001 CER, or the District's home visit constitute a violation or violations of IDEA procedural requirements.  The parents do not point to any specific IDEA provisions or relevant regulations that the District violated by conducting its review and evaluation of Patrick, nor do they cite to any cases that have held that similar evaluative efforts constitute procedural violations of the IDEA.  Upon review of the record, the Court cannot find that the District's evaluation of Patrick represents a procedural violation of the IDEA.

Third, the parents assert that the District failed to accommodate the parents' scheduling needs, and that such failure constituted an egregious procedural defect by precluding the parents from participating meaningfully in the development of Patrick's IEP.  (Doc. No. 36, at 8.)  In support of this argument, the parents offer W.G. v. Bd. of Trustees of Target Range Sch. Dist. No. 23, 960 F.2d 1479 (9th Cir. 1992) and Shapiro v. Paradise Valley Unified Sch. Dist. No. 69, 317 F.3d 1072, 1079 (9th Cir. 2003).  Although they acknowledge the opportunity to participate in the development of Patrick's IEP over eight months, the parents contend that the District's failure to reschedule the December 12 IEP after receiving such request one day prior to the

meeting "effectively excluded them from meaningful participation." (Doc. No. 36, at 8.)

In Target Range, the United States Court of Appeals for the Ninth Circuit held that the failure to include persons knowledgeable of the student during the IEP meeting, together with the failure to consider their recommendations, and the refusal to reschedule the IEP meeting at the parents' request represented significant procedural defects, warranting a finding in favor of the parents. 960 F.2d at 1484-85. In Shapiro, the school district did not coordinate with the parents to schedule the IEP meeting, but rather merely notified the parents of the district's intent to hold a meeting on a particular date. 317 F.3d at 1074. Although the parents informed the district that they would be unavailable to meet on the selected date, and the school district refused to reschedule. Id. Instead of including the parents and a knowledgeable teacher in developing the student's IEP, the school district elected to rely solely on information they had received from parents during prior meetings, and the school district did not conduct an independent evaluation of the student. Id. at 1075. The Ninth Circuit held that the school district's failure to include a teacher from the student's private educational placement and her parents during the IEP meeting were procedural defects and violations of applicable regulations that had the result of denying the student FAPE. Id. at 1074.

Notwithstanding the superficial similarity of both Target Range and Shapiro to the instant case, certain significant distinctions bear mention. First, following the tense November 15, 2001 IEP meeting, the entire assembled IEP team – including the parents – agreed to meet again on December 12, 2001. This date was agreed upon following consultation with members' individual schedules. Unlike in Shapiro, where the school district ambushed the parents with a notice that it would be convening an IEP meeting (after the parents had initiated a due process

hearing), and then refused to reschedule the meeting in spite of the parents' notification that they would be unavailable at the unilaterally selected time, Patrick's parents were directly involved in scheduling the December 12 meeting and never objected to the coordinated meeting until the day before the final meeting was to convene.  Furthermore, the parents concede that they were involved in the process of exploring educational options for Patrick over an eight-month period of negotiations with the District.[6]

Moreover, the parents did not seek to reschedule the meeting because of a surprise change to their own schedules, but rather on the day before the meeting was to convene, their newly-retained attorney notified the District that she was unable to attend.  (Doc. No. 25.)  In fact, in the parents' counsel's letter to the District dated December 11, 2001, she not only announces that she would be unable to attend, but she also reiterates what she apparently told District's counsel during a prior exchange: "During our telephone call today, you indicated that

_____

[6]     In a recent unpublished decision of the United States Court of Appeals for the Third Circuit, the Court noted that in an IDEA action, the plaintiff bears the burden of establishing the harm caused by the claimed procedural shortcomings.  C.M. v. Bd. of Educ., 128 Fed. Appx. 876, 881 (3d Cir. April 19, 2005).  In that case, the Court acknowledged the Ninth Circuit's holding in Target Range that the loss of opportunity for parental participation constituted an alternative educational injury under the IDEA, but found that in the case under review the parents "actively participated in the development of [the student's] IEP at multiple stages."  Id.  Accordingly, the Court held that the parents' claim that they were deprived of the opportunity to participate "in particular isolated decisions is insignificant" in light of their extensive influence over every step of the student's education.  The Court acknowledges that C.M. is an unpublished decision with limited factual discussion, but the Court finds the decision relevant to demonstrate that not every claim by parents that they were unable to participate in every decision relating to their child's IEP will automatically give rise to an actionable claim of an IDEA violation on procedural grounds.  It is true that in this case the parents did not participate in the ultimate IEP meeting out of which Patrick's recommended placement was determined.  However, it is also true that the parents were not deprived of the opportunity to participate in a meeting they helped schedule; rather, they determined not to participate because their newly-retained counsel was unavailable on the agreed-upon date.  Nothing in the record indicates that the parents were unable to participate due to their own scheduling needs.

you would be attending the Dec. 12th IEP meeting <u>in spite of my notice to you that the parents</u>

<u>will not be participating</u>."  (<u>Id.</u>) (emphasis added.)  This scenario is significantly different from

that presented in <u>Shapiro</u>, where the parents were not involved in scheduling or planning the IEP

meeting, and where the district refused to reschedule to meet the parents' timely scheduling

requests.

   To be sure, applicable regulations make clear the importance placed upon parental

participation in the IEP process and require that a school district endeavor to include the parents

in the process:

> Each public agency shall take steps to ensure that one or both of
> the parents of a child with a disability are present at each IEP
> meeting or are afforded the opportunity to participate, including –
> (1) Notifying parents of the meeting early enough to ensure that they
> will have an opportunity to attend; and
> (2) Scheduling the meeting at a mutually agreed upon time and place.

34 C.F.R. § 300.345.  In this case, the record reflects that the District fulfilled its obligations to

"take steps" to ensure Patrick's parents were involved in the development of his IEP, in that they

held a preliminary IEP meeting in July 2001; refrained from issuing a NOREP to afford the

parents an opportunity to work on developing Vista; convened a second IEP meeting in

November 2001 to discuss Patrick's placement; and scheduled a third IEP at a mutually agreed-

upon time on December 12, 2001 to finalize the process.

   The applicable regulations also provide for the steps that must be taken before

conducting an IEP meeting without the participation of one of the student's parents:

> A meeting may be conducted without a parent in attendance if the
> public agency is unable to convince the parents that they should
> attend.  In this case the public agency must have a record of its
> attempts to arrange a mutually agreed upon time and place, such as –
> (1) Detailed records of telephone calls made or attempted and the

32

results of those calls;
(2)      Copies of correspondence sent to the parents and any responses
received; and
(3)      Detailed records of visits made to the parent's home or place of
employment and the results of those visits.

34 C.F.R. § 300.345(d).  It is undisputed that the District scheduled the December 12, 2001 IEP

meeting after mutual agreement with the parents.  It is also clear from the record that the District

corresponded with the parents' new counsel to encourage the parents to participate in the

December 12 meeting, noting that the meeting would go forward in any event if the parents

declined to participate.[7]  (Pl. Ex. 24.)  On these facts, the Court cannot find that the District

violated the IDEA or the regulations applicable thereto by going forward with a meeting that the

parents had agreed to nearly one month in advance, and in which they declined to participate in

because their counsel was unavailable, and because the District insisted upon including members

of IU-15 in the development of the IEP.

The parents also claim the District committed a procedural violation in convening the

December 12, 2001 IEP meeting without the participation of Patrick's proposed special

education teacher.  (Doc. No. 36, at 9.)  The applicable regulations provide, in relevant part, as

follows:

(a)      General.  The public agency shall ensure that the IEP team for each
child with a disability includes –
. . .
(3)      At least one special education teacher of the child, or if appropriate,
at least one special education provider of the child.

---

[7]      Nothing in the record indicates that the District attempted to contact the parents
directly to encourage them to attend the December 12 IEP meeting.  The Court does not find this
improper, as the parents had engaged counsel who was communicating with the District on the
parents' behalf.

34 C.F.R. § 300.344(a)(3).  The District does not deny that Patrick's proposed special education teacher was a member of the IEP team, but notes that there were "multiple 'special education providers'" present at each of the three IEP meetings.  (Doc. No. 47, n.6.)  Additionally, the District underscores the fact that Patrick's special education teacher participated in both the July 18, 2001 and November 15, 2001 IEP meetings, and Patrick's special education teacher had met with IU-15's Rosemary Holecki on numerous occasions to examine goals and objectives relevant to Patrick's IEP and to draft specially-designed instruction or instructional strategies.  (Id.)

The Court finds that the absence of Patrick's proposed special education teacher from the ultimate IEP meeting to be somewhat troubling, and also speculates that the inclusion of this teacher may have offered additional insights into the development of Patrick's IEP. Nevertheless, the Court cannot find that the absence of this teacher on December 12 constituted a violation that alone would invalidate the IEP that was finalized in December 2001, particularly because this teacher had at all other relevant times participated actively and meaningfully in the development of Patrick's IEP and educational strategies and because there was substantial, if conflicting, testimony in the record to indicate that the IEP finalized on December 12, 2001 was

a continuation and revision of the draft IEP that was developed on November 15, 2001.[8]

In their final allegation of procedural violations, the parents claim that "the District violated the parents' procedural safeguards when it determine [sic] the placement, and prepared the NOREP . . . prior to the IEP meeting." (Doc. No. 36, at 9.)  The parents also charge that District witnesses "were willing to testify untruthfully under oath" that the date on the NOREP was a typographical error, but the parents obtained Microsoft Metadata which indicated that the NOREP "was prepared" five days before the December 12, 2001 IEP meeting.  (Id.)  The NOREP was actually issued to Patrick's parents under cover of letter from Sherry Zubeck dated December 19, 2001.  (Def. Ex. K.)

The Court does not find the fact that the NOREP was "created" on December 7, 2001 is a procedural violation of such significance that it should cause the Court to consider the IEP process as sham, as the parents suggest.  The fact that the District initially created a document that eventually formed the NOREP that was formally issued on December 19, 2001, does not ipso facto indicate that the District had concluded that Patrick would be offered a placement with IU-15.  The Court can appreciate the parents' concerns that the District had reached a conclusion

---

[8]     Plaintiffs cite Murphy v. Arlington Central Sch. Dist. Bd. of Educ., 297 F.3d 195 (2d Cir. 2002) in support of their claim that the absence of Patrick's special education teacher from the December 12 IEP meeting was an inexcusable procedural violation.  Parents claim that Murphy concerned a case where the parents were awarded reimbursement for their unilateral placement of their child where the student's IEP team did not include a regular education teacher.  (Doc. No. 36, at 9.)  The parents contend that this alleged holding in Murphy makes it even more compelling to find procedural violations in the instant case.  (Id.)  Upon review of Murphy, which principally addressed issues regarding jurisdiction and exhaustion of remedies, it does not appear the decision discusses anywhere the basis for finding the student's IEP to be inadequate, and the decision contains no discussion regarding the claimed absence of the student's regular education teacher.  The Court thus does not find Murphy to have any application to the parents' claim regarding procedural violation.

about Patrick's placement before convening the final IEP team meeting, but the Court would have to make an inference that the District's IEP team members were not only untruthful during their testimony, but that their full-day IEP meeting on December 12, 2001 was little more than show.  The Court has reviewed the record and documentary evidence and finds ample evidence to conclude that Sherry Zubeck and her colleagues with the District IU-15 colleagues were engaging in a good faith evaluation of an appropriate educational placement for Patrick.  There is no evidence to suggest otherwise.  Furthermore, the mere existence of Microsoft Metadata that establishes the document that became the NOREP was originated on December 7, 2001 does not, alone, prove anything other than the fact that the document was initially created that day.  The same evidence demonstrates that the document was modified on December 19, 2001.  This limited evidence does not prove that the District had unequivocally reached a decision about Patrick's proposed placement.  In short, the Court appreciates the parents' concerns, but they have failed to demonstrate with evidence that the District committed a serious procedural violation by initially creating the NOREP document before the December 12, 2001 IEP meeting.

To summarize, fully appreciating the significance Congress attached to the procedures to be followed under the IDEA, the Court does not find that the parents have sufficiently demonstrated either the existence of the claimed procedural violations in the first place, and even where the parents have plausibly demonstrated an arguable procedural violation, the Court cannot find on the entire record that such procedural violations, singly or collectively, were of such severity or significance that they violated Patrick's or the parents' rights under the IDEA.

### B.        Substantive Claims

The central thrust behind all of the parents' claims is that the IEP the District developed

for Patrick was not tailored to provide meaningful educational benefit to Patrick given his unique

needs and the severity of his autism.  The parents thus allege that "the Hearing Officer and the

Special Education Appeals Panel . . . committed error of law in failing to analyze the IEP not as

a generic IEP for an autistic student, but as a document designed to meet P.J.'s needs."  (Doc.

No. 36, at 10.)  In support of their claims, the parents note the expert psychiatric reports that

were generated by Drs. Thomas Bowers and Michael Murray that each confirmed the extent of

Patrick's autism and the significant challenges he faced without the aid of therapeutic and

educational interventions that combined intensity, consistency, and coordination of services that

were the hallmarks of Patrick's home-based ABA program.  Additionally, the parents point to

the testimony of Donna LeFevre, the director of the Vista school, who testified to Patrick's need

for intensive "ABA based services" in school, home, and community environments.  (Id. at 11.)

During the proceedings before the Hearing Officer, the parents also offered the testimony of Dr.

Jan Handelman, an ABA expert with significant experience in the field of autistic education,

who testified that Patrick required a program as intensive as his home-based program.  Plaintiffs

argue that the evidence demonstrates that Patrick has unique behavioral needs requiring

exclusively ABA-based instruction delivered intensively.  Accordingly, the parents contend that

the District inappropriately recommended placement of Patrick with the IU-15, which was

staffed with personnel who were unqualified to educate Patrick, and as a result the parents claim

the offered placement threatened to cause Patrick significant harm.  The parents claim that the

District failed to present any witness who could contradict the foregoing testimony regarding

Patrick's needs.[9]  The District disputes Plaintiffs' arguments entirely.

Although almost all of the Plaintiffs' witnesses testified that Patrick required an intensive program that incorporated systematically educational and therapeutic techniques designed for Patrick's particular needs, and attested to the format and benefits of ABA methodology, a careful review of the testimony from the witnesses and other documentary evidence does not establish that the IEP the District developed for Patrick, or the educational placement that was made available to him, was inappropriate; indeed, the evidence demonstrates that the IEP developed for Patrick was reasonably calculated to provide meaningful educational benefit.  Throughout the record there was much testimony from the parents and their witnesses as to the superiority of the parents' home program and Vista relative to that available through IU-15.  However, a careful review of the testimony and the documentary evidence the parents rely upon does not cause the

---

[9]        The record in this case is voluminous, with administrative hearings before the Hearing Officer that were conducted over more than fifteen sessions, out of which multiple administrative decisions were issued.  The record and supplemental evidence submitted also consists of transcripts of multiple depositions, a purported expert report, numerous pieces of correspondence between the parties, and other non-testimonial evidence.  Much of the testimony and other evidence concerns the development of Patrick's IEP and the disagreement among the parties as to whether the IEP offered Patrick FAPE.  A rather large portion of the testimony and other evidence also concerns Patrick's subsequent education at Vista, and the strategies employed in that school and in Patrick's home program.  The Court has reviewed all of the evidence submitted in this case by the parties.  However, the Court does not find it necessary or helpful to include discussion of each witness' testimony, or all pieces of supplemental evidence that have been submitted.  The fact that a particular witness's testimony is not discussed or is not discussed in great depth is in no way an indication that the testimony was ignored.  The Court is mindful that the threshold and key issue in the case sub judice is whether the IEP developed for Patrick was reasonably calculated to yield meaningful educational benefit, as required under the IDEA.  Because the Court agrees with both the Hearing Officer and the Appeals Panel that the December 12, 2001 IEP and corresponding NOREP were developed and issued in compliance with the District's obligations under the IDEA, the Court finds it unnecessary to engage in discussion regarding Patrick's current education with Vista or other evidence that concerns periods after the District finalized Patrick's IEP in December 2001.

Court to find that the program offered by the District was substantively inadequate given Patrick's needs.  Moreover, certain of the testimony elicited from District and IU-15 personnel cause the Court to find that the program developed for Patrick was sufficiently intense given his needs, and was calculated to yield meaningful benefit based upon what the parties knew of Patrick at the time the IEP was issued.

Turning to the evidence, the Court first notes that with respect to the psychological evaluation conducted in 1994 by Dr. Thomas Bowers, the report is silent as to specific educational techniques or methodologies that should be employed with Patrick given his condition, other than to note that it would be important to keep Patrick involved in an active course of therapy "up to" 40 hours a week, including speech therapy, occupational services and "wraparound services."  (Pl. Ex. 3.)  Dr. Bowers also noted that the severity of Patrick's autism foreshadowed a course of long-term problems, although with extensive therapeutic involvement his outlook may be "cautiously promising."  (Id.)  The December 12, 2001 IEP provided for one-to-one instruction, occupational therapy sessions, speech and language therapy, and specially-designed instruction that draws upon, inter alia, TEACCH and ABA strategies or systems.  Dr. Bowers's report does not, alone, indicate that the District failed to offer FAPE to Patrick given his needs, as the parents seem to suggest.

Dr. Murray's report, issued on September 5, 2001, is both more timely and more relevant to the parents' charge that the December 12 IEP was inadequate given Patrick's assessed needs. As noted above, Dr. Murray noted that Patrick should be afforded participation in an intensive educational program built around ABA and its educational techniques as the "the only empirically documented forms of treatment to successfully teach[] children with moderate to

severe autism new skills and abilities." (Pl. Ex. 17.)  Accordingly, Dr. Murray recommended

that Patrick participate in an educational program that "fully incorporates an Applied Behavioral

Analysis model into all aspects of the curriculum" and that the parents continue their home

program until such a program could be made available to them.  (Id.)  The Court is puzzled as to

why the December 12 IEP does not discuss this evaluation, which was performed only months

before the IEP was finalized.  Were it not for additional testimony and evidence that both

supports the adequacy of the final IEP, the Court might assign more weight to the absence of Dr.

Murray's report and recommendation.  However, the entire record indicates that the educational

program offered to Patrick could incorporate ABA principles, with sufficient latitude to adjust

the techniques and specially-designed instruction depending on Patrick's exhibited needs.

    The parents also rely on the testimony of Kendra Peacock in support of their charge that

the December 12, 2001 IEP was substantively deficient and that the District did not offer Patrick

FAPE.  As the parents' behavioral consultant, Ms. Peacock worked with Patrick and the parents

for a number of years and was commissioned by the parents to develop a report on Patrick's

present educational levels for use in preparing Patrick's IEP.[10]  When questioned by the parents'

counsel as to whether she believed the December 12, 2001 IEP was appropriate, Ms. Peacock

responded that she thought the goals and objectives and specially-designed instruction contained

---

[10]    The parents initially requested in September 2001 that Ms. Peacock prepare this report, and the parents advised the District that they would provide Patrick's updated educational levels by the end of September 2001, as until that point they had been providing his education through their home-based program and had access to the data collected over a substantial period of time. (N.T. 996; Pl. Ex. 15.)  Ms. Peacock ultimately did not complete the report until the morning of December 12, 2001, on which date she sent it to the parents via Federal Express. (N.T. 992-93.)  Ms. Peacock did not provide the parents or the District with present educational levels during the November 15, 2001 IEP meeting.  (Id. 993.)

in the IEP were "mostly inappropriate." ( N.T. 957.)  Yet, when asked to go through the IEP to

discuss the goals in greater detail, Ms. Peacock's testimony becomes decidedly more mixed.  For

certain annual goals contained in the December 12 IEP, Ms. Peacock testified that they reflected

a relatively low level of expectation because they represented skills Patrick had already mastered

to a significant degree.  (N.T. 959-960.)  Then, however, Ms. Peacock seems to indicate that

many of the goals and objectives reflected in the IEP were, in fact, appropriate for Patrick given

his abilities: "counting to tens to 100, he's counted in tens to at least 60, so I guess you could say

that's appropriate . . . [t]he last four are – you know, those are reasonable expectations . . . .

Identifying beginning and final consonant sounds in words is reasonable. . . . When given

teacher selected picture icons, Patrick will construct a simple sentence.  That – you know, that's

fine. . . . Will copy words remaining within a one and a half.  Now, that's appropriate. . . . Will

comment.  Again, that's an appropriate goal. . . . Patrick will select an item by function when

shown three to four pictures and asked what do you eat with.  That's appropriate. . . . Patrick will

classify objects by critical attributes, color, shape, and size. . . . I don't believe we've actually

done shape and, as I said earlier, size classification is something he could work on.  So that

would – part of that goal would be appropriate."  (N.T. 960-966.)  It is also true that Ms. Peacock

took issue with certain of the goals and objectives reflected in the IEP, in that she believed some

were too challenging and others were beneath Patrick's present ability, but the above testimony

demonstrates that Ms. Peacock found much of the December 12 IEP to reflect appropriate goals

and objectives for Patrick.

With respect to the specially-designed instruction ("SDI") set forth in the December IEP,

Ms. Peacock's testimony is similarly mixed, and she found much of the SDI to be appropriate for

Patrick: "Use of a visual schedule throughout his day.  That's appropriate [under specially-designed instruction]. . . . Use of visuals, icons and written words to increase comprehension and expression, yes as it applies to the teaching process but not as an end product.  Minimizing distractions in his environment, that would be appropriate. . . . Use of a one-to-one professional or paraprofessional to support Patrick across the educational environment.  That's definitely appropriate and in most – in a lot of his day.  Use of simple, succinct and short directions.  Again, that's fine . . . that's appropriate. . . . Use of visual supports, after initial repeat of directions did not yield the desired response. . . . if it's done appropriately, yes, it could be appropriate. . . . Use of peer to practice turn taking activities.  That's great.  You know, it's just going to expand on the skills he already has and give him additional practice.  Use of an appropriate prompt hierarchy.  That's appropriate. . . . I think the use of a picture schedule is fine.  In a structured and regulated setting, sabotaging activities and requests are made.  Absolutely appropriate. . . . Use of discrete trials is certainly something he's used in the past.  Varied reinforcement, backward chaining, planned generalization, and task analysis, of course.  Primary paper with darkened boundaries, sure.  Opportunities for sensory motor breaks as requested by Patrick.  We certainly know that those breaks are reinforcing to him and that it's a really great opportunity to work on his requesting even more . . . ."  (N.T. 967-971.)  As before, although Ms. Peacock also testified to ways in which the she believed the proposed SDI was not entirely appropriate or would benefit from modification, the above testimony plainly shows that she concurred with much of what the District developed in the December 12 IEP.[11]

---

[11]    Those areas that Ms. Peacock believed the December 12 IEP was deficient concerning specially-designed instruction related to repeated practice in a concentrated period of time, which she testified Patrick needed in order to acquire new skills.  (N.T. 972.)  Ms. Peacock

The parents also point to the testimony of Dr. Jan Handelman, a professor at Rutgers University with 30 years of experience studying and working with autistic individuals. Much of Dr. Handelman's testimony was valuable in describing ABA theory and other teaching techniques that are used with autistic students. Additionally, Dr. Handelman provided illuminating testimony regarding the extraordinary educational and therapeutic environment existing at Vista. What Dr. Handelman's testimony did not do, however, was demonstrate conclusively that the IEP offered by the District, and the educational environment available with IU-15, were substantively inadequate for Patrick's needs.

Dr. Handelman visited the IU-15 classroom for approximately one hour. (N.T. 783.) By his own admission, his interactions with staff and observation of the educational environment of the IU-15 was very limited. (Id. 784-785.) Due to the limits placed upon his observations, Dr. Handelman described his experience in the IU-15 classroom as "watching a foreign film and not having subtitles." (Id. 785.) When asked on direct examination about the educational strategies employed in the IU-15, Dr. Handelman was unable to testify with any specificity or confidence. For example, he noted that students were engaged in a speech communication lesson with a speech therapist, but he could not tell whether the instruction was being administered under an overarching ABA strategy. (Id. 787.) Dr. Handelman did observe that the speech therapist was providing reinforcement to the students, but he did not know whether the reinforcement was systematic or issued "according to some plan." (Id.) Similarly, when observing that the

---

also noted that the December 12 IEP omitted certain instruction designed to shift from one-to-one teaching models to one-to-two, one-to-three, and larger groups of students. (Id.) Additionally, Ms. Peacock found the specially-designed instruction for providing reinforcement to Patrick to be deficient in not focusing sufficiently on contingency and timing of such reinforcement. (Id. 973-74.)

classroom employed picture scheduling, Dr. Handelman did not know whether such scheduling was part of a TEACCH strategy or an ABA approach.  (Id. 788.)  Dr. Handelman had equal difficulty determining whether the students were engaged in discrete trials, although he could not say that they were not.  (Id.)  In an effort to glean further information about the IU-15 program, Dr. Handelman submitted a number of written questions to Rosemary Holecki, although he found her answers to be largely unresponsive or unhelpful.  (Id. 798-805.)

In response to questions regarding the appropriateness of the IEP actually offered to Patrick, Dr. Handelman acknowledged that he found the goals and objectives listed were "certainly behavioral in nature and specific."  (Id. 815.)  However, Dr. Handelman noted that he had difficulty assessing "the real appropriateness" of the goals and objectives contained in the IEP, because in his view, the primary importance of the IEP is on the services and supports that are used to achieve the stated goals.  (Id. 815-816.)  Accordingly, in evaluating the IEP the District developed for Patrick, Dr. Handelman's primary focus of inquiry was on the program modifications and SDI.  (Id. 816.)  Regarding these aspects of the IEP, Dr. Handelman noted that the IEP contained strategies that could be considered part of ABA, but his "overall impression" is that what was proposed was not exclusively ABA and did not reflect "a total commitment" to ABA principles, which he believed Patrick needed.  (Id. 816-17.)  However, Dr. Handelman also testified that the IEP did not provide sufficient information for him to conclusively assess whether the IEP reflected an exclusive ABA program, although his "sense [was] that it's not." (Id. 817.)  Dr. Handelman was skeptical that the school-based program would complement Patrick's home program, and he testified that in his professional opinion, Patrick required between 35 and 40 hours of exclusive ABA programming per week.  (Id. 818, 823-24.)

Balancing Dr. Handelman's testimony and his written evaluation of Patrick, produced approximately two months after the District issued Patrick's parents an IEP and NOREP, with the remainder of the evidence in the record does not cause the Court to find that the December 12, 2001 IEP violated the substantive requirements of the IDEA.

The witnesses who were called to testify on behalf of the District provide additional information as to the nature of the IU-15 and the educational strategies that it employs, as well as justification for the IEP developed for Patrick. These witnesses, who had substantial experience educating autistic and other disabled students, also made clear that principles of ABA instruction would be used in Patrick's education. Cathy Scutta, an OT with the CAIU, and who participated in developing Patrick's IEP, testified regarding her training in various autistic educational strategies, about the techniques that would be employed to achieve the goals and objectives contained in Patrick's IEP, as well as the steps that would be taken in the event the IU-15 determined that Patrick's IEP needed to be amended.

Ms. Scutta made it clear that principles of ABA would be used in conjunction with Patrick's IEP. For example, in a response to a question as to whether under the December 12, 2001 IEP Patrick would be receiving ABA-based instruction, Ms. Scutta testified: "Principles of ABA are used in the classroom every day, all day long . . . ." (N.T. 190.) Ms. Scutta also testified that the IU-15 staff utilize a variety of educational strategies, including ABA, depending upon the individual needs of their students. (Id. 191.) On cross examination, Ms. Scutta again readily agreed that principles of ABA should be embedded in Patrick's educational program, along with other methodologies "that get[] Patrick to where he needs to go." (Id. 216.) Ms. Scutta corrected the Plaintiffs' counsel's suggestion that she would just be "picking and

choosing" random strategies to implement specific goals and objectives:

> Goals and objectives are the, you know, the end point to where we need to get. Howe we get there is comprised not, you know, of the SDIs that are written, but also it is, you know, our duty to remain abreast of all new methodologies in the area of autism, and it's not just picking and choosing as though we have no – willy-nilly. It is matching the presentation or the testing to whatever the child needs to attain their goal.

(Id. 216.)  Ms. Scutta also testified that, in implementing the goals and objectives contained in the IEP, she would have engaged in regular assessment of Patrick, to determine whether the goals and objectives and criteria continued to be appropriate or required modification.  (Id. 215.) Ms. Scutta testified that in her professional opinion, the December 12, 2001 IEP was appropriate for Patrick based upon the information the District had available at the time, and she testified that she was confident she could deliver the program outlined in the IEP as it related to occupational therapy services.  (Id. 195.)

Kendra Meyer, an autistic support teacher with the IU-15, also testified on behalf of the District.  Ms. Meyer testified that she would have been responsible for implementing all areas of Patrick's IEP.  (Id. 270.)  Ms. Meyer testified that the methodologies employed in the IU-15 classroom include ABA, as well as other techniques such as structured teaching, social stories, and sensory integration.  (Id. 271.)  Ms. Meyer testified that the IU-15 team would determine which methodologies to employ with a particular student based upon that student's individual needs.  (Id.)  She testified that she was unable to speculate as to exactly how much ABA instruction Patrick would receive because he had never been in her classroom, and thus she had not had the ability to evaluate him.  (Id. 272.)  However, in response to questioning from the Hearing Officer, Ms. Meyer testified that if a student had been receiving services in another location, and the child had been making progress with a particular methodology, she would try to

incorporate such methodology in the student's program with IU-15.  (Id.)  Ms. Meyer also testified that she was confident she could implement the IEP to accomplish the goals set forth for Patrick, although she acknowledged that she would require additional training for some aspects of data collection.  (Id. 288, 290, 297.)

Similarly, Gay Keiser, the assistant supervisor of speech and language with the CAIU with a number of years experience in both private practice and school settings working with students with speech disabilities testified about the December 12, 2001 IEP and the ability of the IU-15 to deliver FAPE to Patrick.  (Id. 403-04.)  Ms. Keiser participated in the November and December IEP meetings, and additionally participated in the November 29, 2001 observation of Patrick's home program.  Ms. Keiser testified that the goals and objectives set forth in the IEP could have been adjusted depending upon Patrick's needs, but that the document contained at least baseline amounts that the IEP team believed would be minimally necessary.  Ms. Keiser echoed other testimony that the methodologies and educational strategies used to achieve the goals and objectives contained in a student's IEP could vary or be adjusted, including use of ABA, TEACCH, and other techniques, depending upon the individual needs of a particular student.  (Id. 485.)  Ms. Keiser testified that in her professional opinion, the IEP finalized on December 12, 2001 was appropriate based upon the present-level reports they had available, as well as the information derived from the home visit.  (Id. 456.)

Rosemary Holecki, the CAIU supervisor of special education, also testified on behalf of the District and the IEP prepared for Patrick.  At the time of the due process hearings in the spring of 2002, Ms. Holecki had been supervisor of the CAIU autism programs for four years. Ms. Holecki has substantial experience in the education of students with disabilities and special

needs, and has participated in a number of different trainings and workshops regarding the education of autistic children, including instruction on ABA and TEACCH strategies.  (Id. 522-526.)[12]  Ms. Holecki initially testified as to the process the IEP team (minus the parents) engaged in on December 12, 2001 to develop goals and objectives for Patrick based upon their observation of his home program, the reports available to the assembled IEP team members relating to Patrick's abilities, as well as the team's overall experience in working with autistic students.  (Id. 547-554.)  Ms. Holecki also testified about the SDIs that would be utilized in Patrick's instruction to achieve specific goals and objectives contained in the IEP.  (Id. 555-57.) Ms. Holecki testified that IU-15 staff and personnel undergo mandatory and optional training in educating autistic children, including training in ABA and TEACCH strategies, among others. (Id. 557-561.)

Regarding the IEP developed for Patrick, Ms. Holecki had difficult speculating precisely how much of his instruction would be delivered through ABA techniques, although she conceded that ABA was not the primary methodology to be employed.  (Id. 561-64.) Nevertheless, Ms. Holecki reviewed the the IEP and the 21 program modifications contained therein to describe for the Hearing Officer how ABA principles or methods could be employed in many of the SDI techniques listed in the IEP.  (Id. 621-629.)  Ms. Holecki also testified that the IEP team endeavored to incorporate opportunities for Patrick to experience inclusion with non-disabled peers in certain areas that the team felt could be controlled to provide for communication and socialization skill development.  (Id. 570-73.)  Although she acknowledged

---

[12]       Ms. Holecki's primary area of expertise, and in which she is certified, is working with students who are blind or otherwise visually impaired.  (N.T. 605.)

that she would have needed to hire additional support staff to successfully implement Patrick's IEP, Ms. Holecki testified that she could have timely hired the necessary staff to support Patrick during his transition to IU-15.  (Id. 660-61.)  Ms. Holecki testified that in her professional opinion, the December 12 IEP was appropriate given what the IEP team knew about Patrick at the time, and she testified that the IU-15 could deliver the program contained in the December 12, 2001 IEP.  (Id. 574, 584-85.)

After careful consideration of the testimony discussed above, together with consideration of the other testimonial and non-testimonial evidence in the record, the Court must agree with both the Hearing Officer and the Appeals Panel in their conclusions that the District complied with the substantive provisions of the IDEA with respect to Patrick's IEP.  Substantial evidence in the record supports a finding that the goals and objectives contained in Patrick's IEP were based upon consideration of information the IEP team derived from numerous sources, including psychiatric evaluations, educational assessments, parental input, and observation of Patrick's then-current educational placement.  The Court finds that the goals and objectives, although perhaps not perfect, were appropriate and designed to provide Patrick meaningful educational benefit.

Similarly, the record contains evidence that the techniques and SDIs that the District and IU-15 proposed to employ in order to achieve the stated goals and objectives were objectively reasonable, geared to help Patrick succeed in a school environment, and would allow IU-15 personnel to tailor such techniques depending upon Patrick's demonstrated needs.  Upon review of the entire record, the Court concludes that the strategies the District contemplated using with Patrick were meaningful, sufficiently intense, and reasonably designed to assist Patrick succeed

in an educational environment.  In so finding, the Court also acknowledges the parents' and their experts' arguments that Patrick required approximately 35-40 hours of ABA delivered by providers trained by nationally-recognized experts in the field, and that any deviation from such a program would be inadequate given Patrick's needs.  The Court has wrestled with the question of whether the somewhat eclectic model of educational strategies offered by the District is appropriate for Patrick given the parents' insistence on an exclusive ABA model delivered by carefully selected individuals.  The record is indeed mixed on this point, but the Court ultimately finds that substantial evidence in the record supports the District's proposal, particularly given what was known about Patrick at the time the IEP was offered.

The parents have taken great issue with the efforts District representatives undertook to evaluate Patrick and prepare for his education, charging specifically that the District was unreasonably ignorant of Patrick's current education levels and dilatory in updating such data. With respect to the charges of delay, it is worth noting that the record indicates that after the District drafted Patrick's initial IEP on July 18, 2001, Sherry Zubeck elected not to issue a NOREP or proceed to due process in order to provide the parents with sufficient opportunity to develop the Vista school, in which they were strongly advocating a placement for Patrick. Indeed, the waiver that the parents executed in August 2001, and which the Appeals Panel found inappropriate, was entered into by mutual agreement between parties that appeared to be negotiating in good faith regarding Patrick's placement while the parents undertook their impressive efforts to take Vista operational.  The Appeals Panel's determination that this waiver was a nullity is not before the Court.  Nevertheless, the Court does note that what might at first appear to be dilatoriness on the part of the District appears from the record to be the result of a

50

good faith cooperative attempt by the District to honor the parents' desires regarding Patrick's education.  It hardly seems contested that once it became clear that Vista would not open for the 2001-2002 school year, all parties found themselves under pressure to develop an appropriate IEP for Patrick given that the school year had commenced, and the primary placement that had been discussed for Patrick was unavailable.

The parents and their counsel were critical of the District's efforts to evaluate Patrick and develop a plan for his education during this time, but on balance the Court does not find the evidence to support the parents' criticisms.  It was the parents who promised the District updated education levels from Patrick's home program in September 2001.  It is uncontroverted that the District was not provided these updated levels at either the November or December IEP meetings, and Kendra Peacock did not provide them to the parents until the morning of December 12, 2001.  The Court cannot agree that the District should be solely held accountable for this failure, particularly given that it was the parents who failed to provide the levels that they had promised the District months before the IEP was finalized.  The development of Patrick's IEP was a collaborative process, as contemplated under the IDEA and applicable regulations.

Moreover, the record supports the District's position that it did rely on Patrick's current levels in developing his IEP, together with the various reports that are listed in the IEP, including that produced by Dr. Crites in June 2001, less than six months before the IEP was finalized.  The record reflects that during the November 15, 2001 IEP meeting, Kendra Peacock reported that the District's overall assessment of Patrick was "very accurate" in describing Patrick's then-current performance.  Indeed, Patrick's mother testified that she was pleased with the November 15, 2001 IEP, at least in part because she "thought it reflected where Patrick was at that point."

(Def. Ex. Q, p. 1359, ll. 15-19.)  Additionally, representatives from the District and the IU-15 visited Patrick's home program on November 29, 2001 in an effort to better understand Patrick's abilities and educational needs.  Although the representatives visited the home for at most one hour, the Court does not find the abbreviated nature of this visit somehow causes the District's efforts to determine Patrick's current levels to be inadequate, particularly given the evidence cited above supporting a finding that the current levels set forth in the IEP were acknowledged by both the parents and their consultant to be relatively accurate.  In sum, the Court finds the District's efforts to evaluate Patrick and obtain meaningful information about his abilities and challenges to have been sufficient, and that the District relied reasonably on these levels and other data in fashioning a program that was intense and carefully tailored to Patrick's individual needs, while being delivered in the least restrictive environment possible.

The Parents are correct that offering a child education within the least restrictive environment is not a substitute for offering FAPE.  See S.H. v. State Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 272 (3d Cir. 2003) ("The School District must first prove that the IEP will provide a meaningful educational benefit.  The School District cannot bootstrap the meaningful educational benefit with the LRE requirement").  However, the IDEA does include a mainstreaming component in its description of a free and appropriate education, requiring education be delivered in the least restrictive environment possible.  See 20 U.S.C. §

1412(a)(5)(A).[13]  Thus, the Third Circuit has interpreted the mainstreaming component of the IDEA as mandating education "in the least restrictive environment that will provide [the student] with a meaningful educational benefit."  T.R. v. Kingwood Township Bd. of Educ., 205 F.3d 572, 578 (3d Cir. 2000).  Because the Court finds that the District offered Patrick FAPE through the individualized program available with IU-15, the Court finds it relevant to note that the District sought to provide an appropriate education for Patrick in the least restrictive environment possible, where Patrick would have opportunity to interact with non-disabled peers in controlled settings.

In sum, the Court agrees with both the Hearing Officer and the Appeals Panel that the District fulfilled its obligations under the IDEA to offer Patrick a free appropriate public education through the IEP finalized on December 12, 2001 and the NOREP issued December 19, 2001.

### C.    Failure to Offer Patrick an IEP for the 2002-2003 Year

It is undisputed that the District did not convene new IEP meetings for the 2002-2003

---

[13]    The IDEA describes "least restrictive environment" as:

> In general.  To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).

school year, nor did the District offer Patrick a new IEP during that school year.  Plaintiffs

contend that this failure represents a violation of the IDEA and that they are entitled to

reimbursement for the costs of educating Patrick at Vista during the 2002-2003 school year.  The

Court disagrees, because the parents advised the District on multiple occasions that they did not

want the District to provide special education services for Patrick during the 2002-2003 school

year.

       For example, on July 9, 2002, the parents' counsel advised the District that Patrick would

remain enrolled in Vista for the remainder of the 2002-2003 school year.  (Def. Ex. C ¶13.)  In a

letter dated October 1, 2002, Patrick's father wrote a letter intended in part to "clarify the

situation for [the District's] lawyers" in which he stated: "The parents are requesting no special

education services from [the District] or [IU-15] whatsoever."  (Def. Ex. N.) (original emphasis.)

In that same letter, Patrick's father asserted that the parents' position would not change until

such time as the District and/or IU-15 "demonstrates the willingness and ability to obtain"

additional personnel trained by nationally-recognized experts in ABA.  (Id.)  Because the parents

perceived that the District and IU-15 did not show any willingness to comply with this demand,

the parents note that they "respectfully decline special education services on a continuing basis."

(Id.)  Three weeks later, in a letter dated October 23, 2002, the parents' counsel informed the

District that "Patrick will remain at Vista for the remainder of the 2002-2003 school year."  (Def.

Ex. L.)  During a deposition taken during these proceedings, Patrick's mother acknowledged that

the parents had no intent of returning Patrick to the District for the 2002-2003 school year.  (Ex.

O, p. 98, ll. 12-17.)

       In light of the clear expression of the Parents interests that they wished the District to

provide no special education services for Patrick for the 2002-2003 school year, the Court cannot find that the parents are entitled to reimbursement for Patrick's education at Vista during that school year simply because the District did not produce a new IEP for Patrick by December 11, 2003, or the first anniversary after the December 12, 2001 IEP.  The law is clear that there is no entitlement to a free appropriate public education for children whose parents have unilaterally placed them in private school.  34 C.F.R. § 300.454(a)(1).  The Court finds that Plaintiffs unilaterally placed Patrick in Vista on February 4, 2002, having rejected the District's offer of FAPE.  Thereafter, the parents at all relevant times indicated that they were not seeking special education services from the District for the 2002-2003 school year.  The Court thus finds the District was not obligated to undertake to develop at new IEP for Patrick given the parents' commitment to keeping Patrick at Vista, and the Court finds that the District is not obligated to reimburse the parents for Patrick's education at Vista during the 2002-2003 school year.

An appropriate Order follows this memorandum.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL J. and DEIRDRE J., as** | : | |
| **Parents And Nearest Friends of** | : | |
| **Patrick J.,** | : | **Civil Action No. 1:03-CV-1104** |
| | : | |
| **Plaintiffs** | : | **(Judge Kane)** |
| | : | |
| **v.** | : | |
| | : | |
| **DERRY TOWNSHIP** | : | |
| **SCHOOL DISTRICT,** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

And now, this 19th day of January 2006, for the reasons set forth in the within

memorandum, **IT IS HEREBY ORDERED THAT**:

1.    Defendant's Motion to Exclude the Report and Testimony of Andrew Klein (Doc.
No. 34) is **DENIED**.

2.    Plaintiffs' Motion for Judgment on the Administrative Record (Doc. No. 35) is
**DENIED**.

3.    Defendant's Motion for Judgment on the Administrative Record (Doc. No. 38) is
**GRANTED**.

4.    The Clerk of Court shall enter Judgment in favor of Defendant Derry Township
School District.

5.    The Clerk of Court is directed close the file.


     S/ Yvette Kane
     Yvette Kane
     United States District Judge